# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA | . |
| | . |
| v. | . |
| | . 22-cr-0044-GZS |
| DARIO GIAMBRO, | . |
| | . |
| Defendant. | . |

### DEFENDANT'S MOTION TO DISMISS INDICTMENT

NOW COMES Defendant, Dario Giambro, and pursuant to Federal Rules of Criminal Procedure 8(a) and 12(b)(3)(B) respectfully moves this honorable Court to dismiss the indictment, on the ground that the statute on which the indictment is predicated is unconstitutional as applied to Defendant.

Defendant is charged with possessing collector-quality firearms in violation of section 922(g)(1) of Title 18 of the United States Code, the "felon dispossession" statute. The indictment charges that he is a felon based on a single 2007 conviction for possessing an unregistered firearm, namely a 1901 Marble Game Getter, which the Government conceded was "a well-known collector's gun," but which it contended required registration after 1938 because of its unusual barrel configuration. Although the Government acknowledged that typically it does not prosecute possession of such unregistered collector-item guns, it prosecuted Mr. Giambro under the strict liability statute as punishment for exercising his Constitutional right to collect, keep and defend his home with firearms. The Defendant respectfully contends section 922(g)(1) is unconstitutionally broad in defining prohibited persons and as applied to him in violation of the Second Amendment and that the amendment precludes the Government from

disemboweling a citizen's right to keep arms based on selective prosecution for a strict liability offense.

## BACKGROUND

The Indictment charges that on January 26, 2022, Defendant possessed firearms in violation of 18 U.S.C. § 922(g)(1). That section makes it unlawful for any person "who has been convicted in any court of, [sic] a crime punishable by imprisonment for a term exceeding one year" (i.e., any felony) to (among other things) "possess in or affecting commerce, any firearm or ammunition."

As the Indictment implies, the only arguable felony of which Defendant has ever been convicted was a single count of possession of an unregistered firearm in 2007. That conviction followed a one-day trial before this Court on September 25, 2007 in the matter bearing docket number 07-cr-41 (the "07 Case"). The trial and sentencing transcripts as well as the U.S. Probation Office's Revised Presentence Investigation Report dated November 14, 2007, attached hereto as **EXHIBIT A** (the "2007 PSR") document the circumstances of this unusual conviction.

On February 10, 2006, local police officers went to Defendant's home in response to an incident in which the Defendant discharged a firearm in defending himself and his home. Paragraph 14 of the 2007 PSR described the incident as "the textbook affirmative defense of the Use of Force in Defense of Premises." As the First Circuit explained, state charges against Mr. Giambro were "dismissed when he was found to have acted in self-defense." *United States v. Giambro*, 544 F.3d 26, 28 (1st Cir. 2008).

Nevertheless, some law enforcement officials obviously objected to the size of the Giambro family collection of older firearms or to his lawful use of a lawful firearm in defending his person and home against an intruder. Officers closely inspected more than two hundred

firearms in the Giambro collection, identifying two firearms they thought might have fit the registration requirements under the National Firearms Act of 1934.  The officials eventually determined that one of the two suspected firearms did not qualify for registration, but they believed the second did, an unaltered, double-barreled 1901 Marble Game Getter that had passed by inheritance from Defendant's grandfather to his father and then to him.  *See* 2007 PSR at 4, 16.  There was no evidence the gun had ever been misused or even fired, and it was indisputably part of a family firearm collection.  The officer who seized the 1901 Game Getter found it in its original box.  (2007 Tr. Transcript, p. 47.)  He was "himself [] a gun collector and was both surprised and impressed when he found" such a "well-known collector's gun."  (2007 Sentencing Tr. p. 15.)  The Government acknowledged, "there's no question it's a collector's gun."  [*Id.*]

      Mr. Giambro had not used the weapon illegally nor had he altered it; and though this curio technically met the criteria set forth in 26 U.S.C. § 5845(a), this was not the sort of weapon Congress was concerned about when it enacted the registration law.[1] Defendant nonetheless was prosecuted.

---

[1] *See also United States v. Posnjik,* 457 F.2d 1110, 1116 (2d Cir. 1972) (Congress was concerned with "gangster-type weapons and weapons of war).  The controlling definition of a "firearm" in section 5845(a) excludes *both* "antique firearms" (limited to various firearms if "manufactured before 1898") and "any device (other than a machinegun or destructive device) which, although designed as a weapon, the Secretary finds by reason of the date of its manufacture, value, design, and other characteristics **is primarily a collector's item and is not likely to be used as a weapon**."  It appears no published decision has carefully addressed how the "determined to be . . . primarily a collector's item" applies in a criminal prosecution.  One judicial passing reference implied the government was required to prove the defendant "knew his [device] was a weapon, not a collector's item." *United States v. Wilson*, 979 F.3d 889, 906 (11th Cir. 2020).  Another court suggested the relevant issue would be "whether the secretary has made – or is likely to make the determination the [device] is primarily a collector's item and not likely to be used as a weapon." *United States v. Introcaso*, 506 F.3d 260, 266, n. 6 (3d Cir. 2007) [reversing conviction and applying rule of lenity to find the device met the "antique" prong of the exception].  At least one court overruled the secretary's refusal to recognize a device met the "collector's item" exception. *Davis v. Erdmann*, 607 F.2d 917 (10th Cir. 1979).  A compelling argument certainly could have been made that the Giambro Game Getter was – and was believed to be – a collector's item.  It was found in its original box, unlike the circumstances in *Wilson,* and there was no evidence the defendant used the device as a weapon. Indeed, the government conceded "there is no question it's a collector's gun."  The trial record shows, however, that without

The Government conceded at sentencing that prosecution was unusual and that with respect to such an unregistered firearm the owners "usually [just] forfeit it and that's the end of it," but that it prosecuted Mr. Giambro because the prosecutor "view[ed] the shooting differently than the defense does." It prosecuted him under the strict liability statute because the State had declined to prosecute him for using a different firearm to defend his home and person. (2007 Sentencing. Tr. 16.)

Fourteen years later, on January 26, 2022, in circumstances described in Defendant's Motion to Suppress, police broke into the Defendant's home and found an extensive firearm collection they apparently had been told was there. Police officers claim Defendant's son disclosed that the Defendant had firearms at his residence. Last May the Defendant was arrested after a Grand Jury returned the Indictment.

## DISCUSSION

**I.     The Felon Possession Statute Is Unconstitutional as Applied to Mr. Giambro**

The Second Amendment provides: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. The Amendment secures the individual right to possess firearms. *See District of Columbia v. Heller,* 554 U.S. 570, 592, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008). It "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. The Supreme Court has rejected any attempt "to treat the right recognized in *Heller* as a second-class right, subject to an entirely different body of

---

mentioning the "collector's item" exception defendant Giambro's trial counsel stipulated the Game Getter met the statutory definition of a firearm and was required to be registered.

rules than the other Bill of Rights guarantees ….." *McDonald v. City of Chicago,* 561 U.S. 742, 780, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010).

After *Heller* and *McDonald*, lower courts generally upheld section 922(g)(1), but they did so using a two-step analysis the Supreme Court last term rejected. *New York State Riffle & Pistol Ass'n v. Bruen,* 142 S. Ct. 2111, 2125, 213 L. Ed. 2d 387 (2022). Courts of appeals had "coalesced around a 'two-step' framework" when assessing Second Amendment claims, combining a historical analysis with means-end scrutiny. *Id*. at 2125. For the first step, the court would establish the Second Amendment's original scope through a historical analysis. *See, e.g., United States v. Focia,* 869 F.3d 1269, 1285 (11th Cir. 2017). If the regulated conduct fell outside the Amendment's original scope, "the analysis can stop there; the regulated activity is categorically unprotected." *United States v. Greeno,* 679 F.2d 510, 518 (6th Cir. 2012). But if not outside the Amendment's scope or if the historical evidence was "inconclusive," the court would proceed to the second step. *See, e.g., Kanter v. Barr,* 919 F.3d 437, 441 (7th Cir. 2019).

In the second step, a court would generally analyze "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right." *Id.* If the "core" Second Amendment right – that is, self-defense in one's home – was burdened, the court would apply strict scrutiny. *Kolby v. Hogan,* 849 F.3d 114, 133 (4th Cir. 2017). Otherwise, it would apply intermediate scrutiny, considering whether the Government had shown that the regulation is "substantially related to the achievement of an important governmental interest." *Kachalsky v. County of Westchester,* 701 F.3d 81, 96 (2d Cir. 2012).

In *Bruen*, however, a six-Justice majority rejected that two-step approach, as involving "one step too many." *Bruen*, 142 S. Ct. at 2127. The Court instead enunciated a new controlling standard:

5

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2129-30. Applying this analysis, the Second Amendment protects against the sort of blanket prohibition on possession of firearms exemplified by section 922(g)(1) when applied to non-violent convictions for strict liability crimes, especially where the government ordinarily would not prosecute the underlying "offense" at all but did so to deprive a citizen of his important constitutional right expressly because of he had exercised his "elevated" Second Amendment right to defend his home and person. Section 922(g)(1), at least as applied to Defendant and his failure-to-register-a-family-heirloom-firearm conviction, must be deemed unconstitutional.

As discussed above, the Second Amendment generally protects the individual right to own and possess handguns, especially in and for the defense of his home. Although some courts have mistakenly suggested that this right does not extend to anyone branded a felon, careful consideration reveals the government does not have unlimited power to brand citizens felons in order to cancel their Second Amendment rights. Though the Constitution does not define "the people" or "right of the people," the same phrase appears in the First Amendment ("Congress shall make no law… abridging… the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."), the Fourth Amendment ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated…"), and the Ninth Amendment ("The enumeration in the Constitution, of certain rights shall not be construed to deny or disparage others retained by the people"). *See Heller,* 554 U.S. at 579. In these contexts, "the people" "refers to a class of

persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community. *Id.* at 580, quoting *United States v. Verdugo-Urquidez,* 494 U.S. 259, 265, 110 S. Ct. 1056, 108 L. Ed. 2d 222 (1990). A "word or phrase is presumed to bear the same meaning throughout a text." *United States v. Coombes,* 2022 U.S. Dist. LEXIS 170323, *9 (N. D. Okl. Sept. 21, 2022), quoting A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, 170 (2012).

The Fourth Amendment clearly applies to convicted felons. *See Bell v. Wolfish,* 441 U.S. 520, 545, 96 S. Ct. 1861, 60 L. Ed. 2d 447 (1979) ("we have held that convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison"). Likewise, the First Amendment applies to felons. *See Kanter v. Barr,* 919 F.3d 437, 452-53 (7th Cir. 2019) (Barrett, J., dissenting); *Coombs*, 2022 U.S. Dist. LEXIS 170323 at *9. In all three of these provisions, as well as the Constitution's preamble, section 2 of Article 1, and the Tenth Amendment, "the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller,* 554 U.S. at 650. Hence, the *Heller* Court found "a strong presumption that the Second Amendment right is exercised individually and belongs to *all Americans."* *Heller,* 554 U.S. at 581 (emphasis supplied).

Because Defendant is and always was an American citizen and because his conduct, possessing firearms in his home, undoubtedly is covered by the plain text of the Second Amendment, the Constitution presumptively protects him from prosecution. *See Bruen,* 142 S. Ct. at 2129-30; *Heller,* 554 U.S. at 592, 635. The question of whether he may nevertheless be prosecuted as a "felon" in possession of firearms is properly relegated to the second step of the *Bruen* test, not the first. *See United States v. Quiroz,* 2022 U.S. Dist. LEXIS 168329, *6-7 (W.D. Tex. Sept. 19, 2022). Hence, it falls to the Government to prove that criminalizing gun

7

possession by a citizen once convicted of a single non-violent, strict-liability offense such as failing to register a firearm that is not particularly dangerous and that the Government concedes was "a collector's gun" "is consistent with the Nation's historical tradition of firearm regulation." *Bruen,* 142 S. Ct. at 2130.

To determine whether a gun regulation is consistent with the Nation's historical tradition, courts must consider "whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Id.* at 2131-32. The First Circuit has yet to apply the new *Bruen* test to section 922(g)(1). The only circuit court opinion to address this matter has been vacated and set for *en banc* review. *Range v. Attorney General,* 2023 U.S. App. LEXIS 1061 (3d Cir. Jan. 6, 2023), *vacating Range v. Attorney General,* 65 F.4th 262 (3d Cir. 2022). Though some district courts have upheld the section, the most trenchant analysis to date was undertaken by then-Judge (now Justice) Amy Coney Barrett in her dissent in *Kanter v. Barr, supra.*

Justice Barrett began her historical analysis by pointing out that the best historical support for a legislative power to permanently dispossess all felons would be founding-era laws explicitly imposing such a ban. *Kanter,* 919 F.3d at 454. "But at least thus far, scholars have not been able to identify any such laws." *Id.* The "only evidence coming remotely close" consists of unsuccessful proposals made by three states' ratifying conventions. *Id.* (citing authorities).

Justice Barrett explores these proposals at length. First, the New Hampshire convention majority recommended that a bill of rights include the following provision: "Congress shall never disarm any citizen, unless such as are or have been in actual rebellion." *Id.* Second, in the Massachusetts convention, Samuel Adams proposed the following language: "And that the said Constitution be never construed to authorize Congress to … prevent the people of the United

States, who are peaceable citizens, from keeping their own arms." *Id.* Lastly, a minority of the Pennsylvania convention suggested: "That the people have a right to bear arms for the defense of themselves and their own State or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them unless for crimes committed or real danger of public injury from individuals…." *Id.* at 455.

Justice Barrett considered these failed proposals vital to the proper historic analysis. First and foremost, none of their limiting language gained any traction when the Bill of Rights was drafted and ratified. *Id.; see also United States v. Perez-Gallan,* 2022 US. Dist. LEXIS 204758, *26 (W.D. Tex. Nov. 10, 2022) ("But those proposed amendments were just that: proposed."). "Second, only New Hampshire's proposal – the least restrictive of the three – even carried a majority of its [own] convention." *Kanter,* 191 F.3d at 455, citing 2 B. SCHWARTZ, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 628, 675, 758 (1971). Furthermore, no state constitution enacted before ratification of the Second Amendment contained similar limitations to the right to bear arms. *See id.,* citing Bolokh, *State Constitutional Rights to Keep and Bear Arms,* 11 Tex. Rev. L. & Pol. 191, 208 (2006).

With respect to the New Hampshire proposal, it would have permitted only the disarmament for the very specific violent crime of rebellion – that is, "a traitorous taking up arms" against the country. *Id.* In the provision submitted by Adams, the reference to "peaceable citizens" was meant to exclude those who breached the peace. *Id.* It was not meant to exclude "all criminals, or even all felons." *Id.* The provision that failed to pass in Pennsylvania was the broadest but most logically should be read as applying to the "subset of crimes suggesting a proclivity for violence." *Id.* at 456. The common concern of all three provisions "is not about

9

felons in particular or even criminals in general; it is about threatened violence and the risk of public injury." *Id.*

This is the concern that animated English and early American restrictions on arms possession. *Id.* In England, officers of the Crown were empowered to disarm anyone they judged to be "dangerous to the Peace of the Kingdom." *Id.,* quoting Militia Act of 1662. English common law similarly "punish[ed] people who [went] armed to terrify the King's subjects" with imprisonment and forfeiture of their "armour." *Id.* In colonial America, those refusing a test of allegiance could be disarmed. *Id.* at 457. In short, as Justice Barrett notes,

> founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety. But neither the convention proposals nor historical practice supports a legislate a power to categorically disarm felons because of their status as felons.

*Id.* at 458. Moreover, the definition of "felony" was "difficult to pin down at the time of the founding." *Id.* at 459.[2] Justice Barrett demonstrated that "history confirms that the basis for the permanent and pervasive loss of all rights cannot be tied generally to one's status as a convicted felon or to the uniform severity of punishment that befell the class." *Id.* at 461.

---

[2] Justice Barrett disproved the occasionally-asserted notion that at the time of the Founding, a felony conviction entailed the forfeiture of all rights. "Felons serving a term of years did not suffer civil death; their rights were suspended but not destroyed. In sum, a felony conviction and the loss of all rights did not necessarily go hand-in-hand." *Kanter,* 919 F.3d at 461. Moreover, the meaning of *felony* was "not precisely the same in any two of the States[.]" *Id.* at 459, quoting James Madison in The Federalist No. 42, at 228 (J. R. Pole ed. 2005). Some states did not use the term "felony" at all. *See generally* Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic,* 57 Clev. St. L. Rev. 461, 479, 485 (2009). Besides, at the time of the founding, there were relatively few felony offenses. *Symposium: Halt & Reform?: The Death Penalty & Criminal Sentencing Guidelines Reform: The Value of Confrontation as a Felony Sentencing Right,* 25 Widener L.J. 108, 131-32 (2016). The First Congress had enacted only 22 crimes in 1790. *See* King & Klein, *Essential Elements,* 54 Vand. L. Rev. 1467, 1507-08 (2001). Needless to say, these offenses did not include failure to register a gun or anything remotely similar. The framing-era common law had a restrictive conception of felonies, which did not even include, for example, attempted murder, aggravated assault or kidnapping. *See* Davies, *The Fictional Character of Law-and-Order Originalism: A Case Study of the Distortions and Evasions of Framing-Era Arrest Doctrine in Atwater v. Lago Vista,* 37 Wake Forest L. Rev. 239, 283 (2002).

Justice Barrett acknowledged that in the eighteenth and nineteenth centuries, felons could be disqualified from exercising certain rights such as rights to vote and serve on juries because these rights belonged only to "virtuous citizens." *Id.* at 462. However, these virtue exclusions applied to civic rights, exercised for the benefit of the community, rather than individual rights. *Id.* at 462-63. *Heller* (as Justice Barrett pointed out) squarely holds that the Second Amendment confers an *individual* right to keep and bear arms, rather than a civic right. *Id.* at 463. Individual rights like the right to bear arms simply were not treated the same as civic rights for exclusionary purposes. To illustrate, by 1957, twenty-four state constitutions expressly excluded felons from the franchise; yet no state constitution imposed a similar exclusion with respect to the right to keep and bear arms. *Id.* at 463-64. There is thus no basis for assuming that a virtue requirement limited the latter right. *Id.,* citing *Binderup v. Attorney General,* 836 F.3d 336, 372 (3d Cir. 2016) (Hardiman, J., concurring in part) (no historical evidence that "'virtuousness' was a limitation on one's qualification for the right [to keep and bear arms] – contemporary insistence to the contrary falls somewhere between guesswork and *ipse dixit"*).

Justice Barrett concluded that section 922(g)(1) was unconstitutional as applied to a gun owner who had been convicted of the nonviolent felony of mail fraud. Though that conclusion was not adopted by the *Kanter* majority, the two other judges on the panel a*greed* that the historical evidence that felons were excluded from firearm possession at the time of the founding was "inconclusive at best." *Id.* at 445, quoting *United States v. Williams,* 616 F.3d 685, 692 (7th Cir. 2010). The two-judge majority upheld the statute solely by recourse to the means-end analysis that *Bruen* categorically rejected. Because *Bruen* further makes clear that "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," the panel finding that the

11

evidence of such a tradition is "inconclusive at best" effectively concedes that the presumption of unconstitutionality cannot be overcome. *See Bruen,* 142 S. Ct. at 2127. Hence, the views of all three judges in *Kanter* compel the conclusion that section 922(g)(1) cannot pass muster under *Bruen* when applied to nonviolent felonies, let alone to strict-liability felony convictions involving selective prosecutions expressly intended to confiscate Second Amendment rights because a disfavored citizen exercised his corer Second Amendment right lawfully to defend his home.

Justice Barrett joined the solid majority in *Bruen.* Though the case did not address section 922(g)(1), it would be struthious to ignore the near certainty that when the issue does reach the Supreme Court, Justice Barrett's careful analyses will find favor with her fellow justices. And although *Bruen* did not directly address the felon-possession statute its analysis is binding precedent and announces clearly that the Court cherishes and protects Second Amendment rights.

Justice Barrett's analysis is well supported by the scholarship on this issue. *See, e.g.,* Marshall, *Why Can't Martha Stewart Have a Gun?,* 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009) ("bans on convicts possessing firearms were unknown before World War I"); Winkler, *Heller's Catch-22,* 56 UCLA L. Rev. 1551, 1563 (2009) ("The Founding generation had no laws… denying the right to people convicted of crimes."); Larson, *Four Exceptions in Search of a Theory: District of Columbia and Judicial Ipse Dixit,* 60 Hastings L. J. 1371, 1376 (2009) ("state laws prohibiting felons from possessing firearms or denying firearms licenses to felons date form the early part of the twentieth century"). Indeed, the first general prohibition on felon gun

possession was not enacted until 1961. *See Kanter,* 919 F.3d at 464 n. 12.[3] This scarcely suggests consistency with "this Nation's historical tradition of firearm regulation" dating back to ratification of the Second Amendment. *See Bruen,* 142 S. Ct. at 2135.

Even if some states generally banned felon gun possession during the few decades before the 1961 amendment to the Federal Firearms Act,[4] this would not be sufficient consistency with "the Second Amendment's text and historical understanding." As the *Bruen* Court cautioned, "when it comes to interpreting the Constitution, not all history is created equal." *Bruen,* 142 S. Ct. at 2136. After all, "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them." Id.,* quoting *Heller,* 554 U.S. at 634-635 (emphasis in *Bruen).* Hence, courts must "guard against giving post-enactment history more weight than it can rightly bear." *Id.* Hence, "late-19th-century evidence" – to say nothing of 20th century developments – "cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154. *See also id.* at 2163 (Barrett, J. concurring) ("today's decision should not be understood to endorse freewheeling reliance on historical practice form the mid-to-late 19th century to establish the original meaning of the Bill of Rights."); *United States v. Price,* 2022 U.S. Dist. LEXIS 186571, *3 (S.D.W. Va. Oct. 12, 2022) ("Because the Second Amendment was adopted in 1791, only those regulations that would have been considered constitutional then can be constitutional now.").

---

[3] For the quarter century before 1961, the original Federal Firearms Act's arms prohibition was limited to those convicted of a "crime of violence." 52 Stat. 1250, 1250 (1938); *see* United States v. Barton, 623 F.3d 168, 173 (3d Cir. 2011); Marshall, *Why Can't Martha Stewart Have a Gun?,* 32 Harv. J.L. & Pub. Pol'y 695, 698 (2009).

[4] "[O]ne can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I." Marshall, *supra,* at 708.

13

Other courts have embraced Justice Barrett's analysis. For example, in the recent case of *United States v. Harrison,* 2023 U.S. Dist. LEXIS 18397, *19-35 (W. D. Okl. Feb. 3, 2023), the court, after an extensive canvas of the historical evidence, concluded that "there is little existing historical evidence to support the proposition that a legislature can deprive persons who engage in felonious conduct of the right to possess arms" merely because of their status as felons. *See also United States v. Goins,* 2022 U.S. Dist. LEXIS 229543, *33 (E. D. Ky. Dec. 21, 2022):

> Indeed, a review of the evolution of the common law and its adoption in the colonies shows a consistent theme. From Bracton to Blackstone, the common law understood that the sovereign could strip individuals of weapons if it deemed them violent or a threat to disturb the peace. The colonists inherited this understanding as well.
>
> By contrast, the record regarding colonial understanding that felons were automatically excluded from the right to bear arms is far more uneven. … By far the most consistent theme that emerges from history is that the Government could disarm those who are violent or a threat to the peace.

Even before *Bruen,* the First Circuit acknowledged that the Supreme Court "may be open to claims that some felonies do not indicate potential violence and cannot be the basis for applying a categorical ban" and "might even be open to highly fact-specific objections." *United States v. Torres-Rosario,* 658 F.3d 110, 113 (1st Cir. 2011), *cert. denied*, 565 U.S. 1271 (2012). *See also Binderup v. Attorney General,* 836 F.3d 336 (3d Cir. 2016) (en banc) (upholding as-applied Second Amendment challenge to section 922(g) by individuals convicted of corrupting a minor and unlawfully carrying handgun without license); *United States v. Williams,* 616 F.3d 685, 693 (7th Cir. 2010), *cert. denied,* 562 U.S. 1092 (2010) ("we recognize that § 922(g)(1) may be subject to an overbreadth challenge at some point because of its disqualification of all felons, including those who are non-violent"); *United States v. Pruess,* 703 F.3d 242, 247 (4th Cir. 2012) ("there in theory might be an as-applied Second Amendment challenge to 922(g)(1) that could succeed") (internal quotations marks omitted).

Courts agree that section 922(g)(1) should be deemed constitutional when applied to violent felonies. Some courts have gone further and indicated the statute would be constitutional where the behavior for which the defendant was convicted revealed a dangerous disposition, even if the crime itself did not involve violence. Yet that still leaves a vast array of felonies (most of which were unknown in the eighteenth century) that involve neither violence nor a safety risk. If the statute may constitutionally apply to *any* felony prosecution with unlimited discretion, the majority may turn virtually any conduct into a felony regardless of whether any judge would ever actually impose a year's sentence for the slight, and the majority may then selectively enforce the law by targeting those they wish to disenfranchise and whose gun rights they seek to disembowel. *See Harrison,* 2023 U.S. Dist. LEXIS 18397, \*19-20. This would eviscerate the Second Amendment as construed by the Supreme Court. *Cf. Bruen*, 142 S. Ct. at 2156 (right to keep and bear arms cannot be treated as "a second-class right"), *quoting McDonald*, 561 U.S. at 780.

This is precisely what happened to Mr. Giambro. He was convicted for failing to register a Victorian-era family heirloom that the Government conceded was "without question a collector's gun" and that was not objectively more dangerous than the other antiquated items in the impressive Giambro family collection. This was plainly a non-violent, non-dangerous violation that happens to be punishable by imprisonment for more than a year. Indeed, the Government conceded it ordinarily would not prosecute the matter. Even applying discredited standards, nobody can seriously argue that his conviction manifests a general contempt for the law or less virtue than that of the average citizen. In short, his conviction of a single count under 26 U.S.C. § 5845 does not furnish a ground for depriving him of his right to keep and bear arms that is consistent with the Nation's tradition of firearms regulation or that would have been

recognized at the time of the Bill of Rights' ratification. *Cf. United States v. Rahimi,* 2023 U.S. App. LEXIS 2693 (5th Cir. Feb. 2, 2023) (vacating conviction under section 922(g)(8) because government failed to demonstrate restriction of Second Amendment rights of domestic violence offender fit within nation's historical tradition).

## II. The Second Amendment and Equal Protection preclude the government from revoking Second Amendment rights as punishment for the lawful exercise of those rights

The fact that Mr. Giambro was selectively prosecuted in 2007 for the express purpose of revoking his Second Amendment rights because he had exercised those same rights provides an alternative reason, under the Equal Protection clause and the Second Amendment, why this prosecution must be dismissed. The Government conceded at Mr. Giambro's 2007 sentencing that his prosecution for the strict liability offense of possession of an unregistered "collector's gun" had been a selective and atypical prosecution motivated by the prosecutor's objection to Mr. Giambro's unrelated, lawful and "textbook" use of a firearm to defend hearth and home. One year later, the *Heller* Court clarified such use of firearms is a right "elevate[d] above all other interests" just "like the First" Amendment right of free expression.

Government action to punish or disfavor a citizen for his use of protected speech violates the First Amendment. *See Wandering Dago, Inc. v. Destito,* 879 F.3d 20, 40 (2d Cir. 2018)[directing district court to grant summary judgment for vendor denied license for its use of racially-charged item names on its menu]; s*ee also Iancu v. Brunetti*, 139 S. Ct. 2294 (2019)[overturning denial of trademark based on "immoral or scandalous" content]; *Metal v. Tam*, 137 S. Ct. 1744 (2017)[overturning denial of trademark based on "disparaging" content]. The *Wandering Dago* court explained that denying a license based on protected speech, even highly offensive speech, violated equal protection, as well as the First Amendment, because it

16

discriminated against protected conduct. *Wandering Dago, Inc. v. Destito,* 879 F.3d at 40. The court quoted *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007), for the proposition Equal Protection protects citizens and businesses from being "treated differently from other similarly situated [citizens or] businesses . . . based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Wandering Dago, Inc. v. Destito,* 879 F.3d at 40.

Although impermissible selective prosecution or enforcement cases have most often involved race or First Amendment rights, the Supreme Court has made clear that the Second Amendment sets forth fundamental, personal rights and is "like the First" Amendment in significance, history, and other respects. Just as the First Amendment elevates the right to unbridled expression, the Second "elevates above all other interests the right of law abiding, responsible citizens to use arms in defense of hearth and home." *Heller* 554 U.S. at 635.

If the Second Amendment is "like the First" in elevating above competing interests the right to lawful use of firearms to defend the home, it necessarily follows that, just as the government may not prosecute a citizen for his protected speech and, as a consequence of the prosecution, thereafter revoke his right to free expression, so, too, the government may not selectively prosecute a citizen for a strict liability crime because he lawfully exercised his Second Amendment right to defend his home and, thereafter, use the prosecution permanently to revoke his Second Amendment rights. Instead, both the Second Amendment and Equal Protection Clause prohibit such selective retribution for the exercise of fundamental rights. See also *Gibson v. Superintendent*, 411 F.3d 427, 440-41 (3d Cir. 2005); *Fairbanks v. O'Hagan,* 255 F. Supp. 3d 239, 245-46 (D. Mass. 2017).

## CONCLUSION

The indictment is predicated solely on a statute that is unconstitutional as applied to the Defendant's conduct, and this prosecution is the culmination of an impermissible attempt to revoke fundamental rights for the lawful exercise of those rights. Accordingly, the indictment must be dismissed.

**EXECUTED** at Portland, Maine, this 16th day of February 2023.

/s/ Edward S. MacColl
Edward S. MacColl, BRN #2658

/s/ Marshall J. Tinkle
Marshall J. Tinkle, BRN 2833
Attorneys for Defendant Dario Giambro

Thompson, MacColl & Bass, LLC, P.A.
15 Monument Square, 4th Floor
P.O. Box 447
Portland, ME  04112-0447
(207)  774-7600
emaccoll@thomport.com

## CERTIFICATE OF SERVICE

I, Edward S. MacColl, certify that, on the date set forth above, I made due service on the United States Attorney of the foregoing filing by electronically filing the same using the Court's EM/ECF system, which will cause the same to be served on all counsel of record.

/s/ Edward S. MacColl
Edward S. MacColl, BRN #2658