## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

UNITED STATES OF AMERICA )
)
)
v. )
) Docket no. 2:22-cr-00044-GZS
DARIO GIAMBRO, )
)
)
Defendant. )
)

## ORDER ON MOTION TO SUPPRESS

Before the Court is Defendant Dario Giambro's Motion to Suppress (ECF No. 65).  On March 28, 2023, the Court held an evidentiary hearing on the Motion.  Having considered the Motion, related filings (ECF Nos. 88, 91-1 – 91-4, 96, 111 – 12),[1] and the evidence presented, the Court DENIES the Motion for the reasons stated herein.

## I.    FACTUAL FINDINGS[2]

As approximately 11:12 a.m. on January 26, 2022, the Oxford County Regional Communication Centers Dispatch ("Dispatch") received a call from an employee at the Stephens Memorial Hospital (the "Hospital") in Norway, Maine.  The employee requested that an officer be dispatched to the Hospital, reporting that an individual had brought his father there "because he [was] confused" and "his mother [was] at the house deceased . . . and . . . they [did not] know what

---

[1] The original exhibits (ECF Nos. 65-1 to 65-4) to Defendant's Motion were stricken from the record.  See ECF No. 92.  The Court accordingly cites to the refiled exhibits (ECF Nos. 91-1 to 91-4).

[2] The Court has drawn the factual narrative that follows from the preponderance of the credible evidence in the record, including the testimony by Corporal Robert Federico of the Norway Police Department, Lieutenant Chancey Libby of the Oxford County Sheriff's Office (and Special Agent with the Maine Drug Enforcement Agency), and Sergeant Daniel Hanson and Trooper Adam Fillebrown of the Maine State Police.

happened to the mother." (Gov. Ex. 1 at 00:56-01:21; see Gov. Ex. 1A.) The son was identified as Antonio Giambro ("Antonio") and the father as Dario Giambro ("Dario" or "Defendant"). Dispatch relayed this information to Corporal Robert Federico ("Cpl. Federico"), an officer from the Norway Police Department. While en route to the Hospital, Cpl. Federico determined that there were two Maine addresses on record for Dario, one in Hebron and another in Paris. Cpl. Federico also looked up Dario's "names file," a computerized record that allows local law enforcement to enter and view comments about an individual. The file contained comments from 2008 and 2010 noting that Dario: was "very" anti-law enforcement; had previously shot a subject, created a police standoff, and possessed more than 100 firearms; and was on federal probation under the supervision of a probation officer who thought that Dario could be a "problem" with law enforcement officers and was armed.[3]

Cpl. Federico arrived at the Hospital at approximately 11:21 a.m. and spoke with Antonio in the lobby of the emergency department while Dario sat in Antonio's car outside. During his conversation with Cpl. Federico, Antonio expressed concern about Dario's physical and mental health several times.[4] Antonio also relayed the following information to Cpl. Federico:

> He had recently returned from vacation and, the night prior, had gone to plow the
> snow outside the residence of his parents, Dario and Arline Giambro ("Arline"), in

---

[3] See Gov. Ex. 6 (Oxford County Sheriff's Office names file for Dario Giambro). This exhibit was admitted for the limited purpose of demonstrating what information Cpl. Federico learned and considered while en route to the Hospital.

[4] At some point while Cpl. Federico was at the Hospital, a physician and one or two nurses or CNAs from the emergency department came out to Antonio's car to speak with Dario. Based on their brief evaluation and Dario's answers to certain questions, the emergency department staff determined that there was no basis to take him into protective custody at that time. Under Maine law, a "health officer, law enforcement officer, or other person may apply to admit a person to a psychiatric hospital" if the applicant states (and explains the grounds for believing) that "the person is mentally ill and, because of the person's illness, poses a likelihood of serious harm." See 34-B M.R.S.A. § 3863. Additionally, a law enforcement officer may take a person into protective custody only if he "has probable cause to believe that [the] person may be mentally ill and that due to that condition the person poses a likelihood of serious harm" to himself or others. Id. § 3862; see id. § 3801(4-A).

Hebron ("the residence").  However, he was unable to make contact with either of them despite knocking on the front door of the residence and calling throughout the evening.  It was not until the following morning, January 26, that Dario answered the phone.  Because Dario sounded "off" during that phone conversation, Antonio again traveled to his parents' residence.  Once there, Antonio did not see his mother (and Dario's wife), Arline, but spoke with Dario.  Dario commented that Arline had died while Antonio had been away on vacation.  When Antonio attempted to inquire as to what specifically happened to Arline, Dario would offer only cryptic or evasive answers to the effect of "she didn't wake up" and "these sort of things happen."  Antonio asked whether any ambulance or police had been by the house, and Dario responded that they had not.  He also asked where Arline's body was, and Dario responded that she was not in the house and that they lived "on a homestead."  Antonio told his father that he would take him to lunch but instead brought him to Hospital.[5]

(Transcript of Cpl. Federico Testimony (ECF No. 119), PageID #s 557-61.)

At approximately 11:26 a.m., Cpl. Federico informed Dispatch that the residence at issue was in Hebron and that "the father is telling the son that the mother died but she's not in the house and he won't say where she is."  (Gov. Ex. 4 at 00:37-00:52; see Gov. Ex. 4A.)  He suggested that a deputy from the Oxford County Sheriff's Office – which has jurisdiction over Hebron – be dispatched to the Hospital.  At approximately 11:31 a.m., Cpl. Federico called Dispatch again and suggested that "Oxford [] may want to let the [responding] deputy know that [Dario] has multiple comments in his names file."[6]  (Gov. Ex. 5 at 00:19-00:24; see Gov. Ex. 5A.)  He subsequently

---

[5] Defendant asserts that Cpl. Federico "said he had a conversation with [Antonio] about his father having firearms, but he did not say he shared that information."  Def. Post-Hearing Brief (ECF No. 111), PageID # 417.  However, Cpl. Federico testified that he did not recall having any conversation with Antonio about firearms in the residence.

[6] According to Cpl. Federico, he informed Dispatch about the comments in Dario's file so that responding officers would be aware that Dario may not be "very open" to law enforcement and so that they could adjust their tactics accordingly when speaking with him.  See Transcript of Cpl. Federico Testimony, PageID # 566.

spoke with Deputy Brandon Tiner from the Oxford County Sheriff's Office to share the information that Antonio had reported and discuss the comments in Dario's names file. Cpl. Federico did not speak with Dario while at the Hospital other than at one brief point in which he attempted to convince Dario to stay when he exited Antonio's vehicle and tried to leave.

Around this time, four officers responded to the residence to check the status of Arline, arriving between approximately 11:46 and 11:54 a.m.: Sergeant Daniel Hanson ("Sgt. Hanson") of the Maine State Police[7] and Deputy Tiner, Deputy Brandon Pelton, and Lieutenant Chancey Libby ("Lt. Libby")[8] of the Oxford County Sheriff's Office. One of the officers knocked on the door of the residence, and Lt. Libby and Sgt. Hanson walked around the back of the residence to look for any tracks in the snow but did not find any.[9] The officers attempted to look in several windows, but there was plastic and/or blinds obscuring their view. They also looked in the windows of the garage located by the residence but did not see anyone. Lt. Libby then loudly banged on the front door, yelled "Sheriff's Office," and repeatedly instructed anyone inside to answer the door. The officers also verified with Dispatch that there had not been any recent

[7] Sgt. Hanson responded to the residence because he had received a call from a lieutenant with the Maine State Police requesting that he assist officers from the Oxford County Sheriff's Office who had arrived at the residence. The lieutenant advised Sgt. Hanson that an individual had brought his father to the hospital after attempting to check on his parents at their residence, that he found his apparently ill father there but not his mother, and that the father had not provided any clarification as to the mother's whereabouts. Once he arrived, Sgt. Hanson spoke with Deputy Tiner and obtained further details about the situation, including that the father had told the son that the mother was deceased but had not provided further information and that a funeral home had not been called. Deputy Tiner also noted that he had previous contact with the father, as he had done a welfare check on the mother at the residence about a year prior in which he was not permitted to speak with her other than through a window.

[8] On January 26, 2022, Lt. Libby – who is also a Special Agent with the Maine Drug Enforcement Agency – was responding for the Oxford County Sheriff's Office. He responded to the residence to assist Tiner, who was a junior deputy with little law enforcement experience and the primary deputy responding to the residence.

[9] At this point, Lt. Libby had only spoken with Deputy Tiner about the current circumstances and understood that Arline was unaccounted for and that Antonio had brought Dario to the hospital because Dario had made vague statements suggesting Arline had died.

medical calls or requests for assistance at the residence.  After these efforts proved unsuccessful in rousing anyone from the residence, Lt. Libby asked Sgt. Hanson whether the officers would be entering the residence, and Sgt. Hanson responded affirmatively.  At some point before entering the residence, the officers communicated with Maine State Police Trooper Adam Fillebrown ("Tpr. Fillebrown").[10]  The officers did not seek permission from Dario to enter and search the residence.[11]  Nor did they dispatch any ambulance or EMT to the residence.  At approximately 11:57 a.m., the officers forced the door open and entered the residence while Tpr. Fillebrown was en route to the Hospital.[12]  Upon entry, the officers announced their presence, called out Arline's name, and asked if anyone was present.  They walked through the various rooms – one of which was locked and had to be forced open – but did not locate Arline.  During their search, they observed several firearms throughout the residence.  (See Gov. Ex. 12.)[13]  The officers exited the residence at approximately 12:05 p.m.

A few minutes prior to their exit, Tpr. Fillebrown had arrived at the Hospital.  He briefly spoke with Cpl. Federico and Antonio but did not speak with Dario.[14]  At Tpr. Fillebrown's

---

[10] Tpr. Fillebrown was instructed by his supervisor to respond to the Hospital.

[11] According to Sgt. Hanson, it is the policy of the Maine State Police to respond to reports of an unattended death (i.e., the death of an individual that occurs outside of a medical facility) and investigate the circumstances of the death.

[12] At the evidentiary hearing, Lt. Libby and Sgt. Hanson testified that the purpose of the entry was to search for Arline and verify her condition.  Sgt. Hanson also testified that obtaining a warrant generally takes a couple of hours and that the officers did not seek one prior to their entry because there was no crime at the time and Arline was potentially inside the residence in need of medical attention.

[13] The officers did not seize the firearms during this search of the residence.  Government Exhibit 12 consists of four photographs of the numerous firearms that Sgt. Hanson observed when he entered the residence.

[14] Shortly thereafter, at approximately 12:13 p.m., Cpl. Federico left the Hospital and did not have further involvement with Antonio or Dario.

request, Antonio drove Dario to the Oxford Police Department.[15]  Maine State Police Detectives

Ethel Ross and Marcus Reny met with Antonio there.[16]

Back at the residence, at Tpr. Fillebrown's direction, the officers directed their attention to

the garage on the property.  While attempting to locate an item to help clear out debris in front of

the garage door, Sgt. Hanson stepped on top of a snowbank and noticed old tracks in the snow on

the other side of the snowbank.  He followed the tracks and discovered, at approximately 12:50

p.m., an unhinged door on top of the snow, under which was a body-sized object wrapped in cloth

and plastic.  The object was later identified as Arline's body.[17]

Shortly after this discovery, Lt. Libby left for the Oxford County Sheriff's Office to run a

criminal background check on Dario.  The remaining officers remained on scene to wait for Maine

State Police detectives.  A criminal history check of Dario revealed a prior conviction for

possession of an unregistered firearm, which prohibits him from possessing any firearms.  Maine

State Police subsequently sought a state warrant for any and all firearms at Dario's residence.

Detective Reny's affidavit in support of the warrant recited the observations made by the officers

who entered Dario's residence.  (See generally Gov. Ex. 17.)  After a warrant was issued, Maine

State Police seized numerous firearms and a large amount of ammunition from Dario's residence.

## II.  DISCUSSION

In April 2022, a federal grand jury charged Defendant Dario Giambro with one count of

being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a), based

---

[15] Based on the testimony presented at the hearing, it is unclear what time Antonio and Dario arrived at the Oxford Police Department.  However, it is clear that officers had entered the residence by the time Antonio and Dario arrived at the Oxford Police Department.

[16] Neither detective appeared as a witness at the evidentiary hearing.  Based on the evidence presented, it is unclear whether they interviewed or otherwise spoke with Dario at that point.

[17] The medical examiner's office ultimately determined that Arline died of natural causes.

on his possession of sixteen firearms on or about January 26, 2022.  (ECF No. 3, PageID # 2.)  As noted in the Indictment, Defendant had previously been convicted of the felony of possessing an unregistered firearm in violation of 26 U.S.C. §§ 5861(d), 5841, 5845(a), 5845(e), and 5871.  (Id.)

Defendant subsequently filed the present Motion to suppress all evidence obtained from the officers' entry into his home on January 26, 2022, and evidence "seized under a search warrant issued based on what the officers found during the [] entry."  (Def. Mot. (ECF No. 65), PageID # 179.)  In that Motion, he asserts that the officers' entry into his home was illegal because "[t]here were no exigent circumstances," and the officers did not "have any reason to believe that such circumstances existed."  (Id., PageID # 177.)[18]  The Government, in turn, maintains that "[t]he emergency-aid exception justified the warrantless entry into [D]efendant's home."  (Gov. Resp. (ECF No. 88), PageID # 341.)

The Court begins with the basic premise that "warrants are generally required to search a person's home . . . unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment."  Mincey v. Arizona, 437 U.S. 385, 393-94 (1978) (internal quotation marks omitted).  "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury."  Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006).  Accordingly, "law enforcement officers may enter [a home] without a warrant when" there is a "need to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."  Caniglia v. Strom, 141 S. Ct. 1596, 1599 (2021) (cleaned up).

---

[18] To the extent Defendant's Motion advanced a cursory allegation that he "was not informed of his *Miranda* or other rights" when he was "detained" by officers, Def. Mot., PageID # 173, the Court notes that Defendant failed to substantiate or otherwise develop this claim in the hearing or briefing that followed. Accordingly, the Court has not considered this claim.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

Critically, the "'emergency aid exception' does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises." Michigan v. Fisher, 558 U.S. 45, 47 (2009) (per curiam). "It requires only 'an objectively reasonable basis for believing' that 'a person within [the house] is in need of immediate aid.'" Id. (citations omitted); see Brigham City, 547 U.S. at 404-05 ("An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.'" (citation omitted)). "This basis need not 'approximate probable cause.'" Hill v. Walsh, 884 F.3d 16, 23 (1st Cir. 2018). Additionally, "reasonableness 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight' and that '[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.'" Ryburn v. Huff, 565 U.S. 469, 477 (2012) (quoting Graham v. Connor, 490 U.S. 386, 396-397 (1989)).

"To determine whether a law enforcement officer faced an emergency that justified acting without a warrant, [a] [c]ourt looks to the totality of circumstances." Missouri v. McNeely, 569 U.S. 141, 149 (2013). "[A] 9-1-1 call or a welfare check request does not, by itself, establish exigent circumstances: entitlement to the exception requires convincing 'indicia of distress.'" Ocasio v. City of Canandaigua, 513 F. Supp. 3d 310, 320 (W.D.N.Y. 2021) (citing Pennington v. City of Rochester, 2018 WL 3023383 at *4 (W.D.N.Y. 2018)). "Such indicia may include, for example, a witness's or victim's report of a serious injury or medical emergency, or an inability to locate a missing and vulnerable individual to confirm their well-being despite a reasonable investigation and other attempts to reach them." Id. "Courts have found the exception applicable in matters where, for example, . . . a missing elderly couple did not respond after officers knocked

on their front and back doors for 20 minutes, and searched in vain for them around their neighborhood and at the community center they frequented."  Id.

Based on the record before it, the Court concludes that exigent circumstances supported the officers' warrantless entry into Defendant's home.  This is not a case in which a "welfare check request . . . by itself" instigated the officers' warrantless entry into the residence.  See Ocasio, 513 F. Supp. 3d at 320.  Nor is this "a case in which . . . police [] barge[d] into someone's home . . . merely based on the receipt of a tip that there is a dead body inside."  United States v. Beaudoin, 362 F.3d 60, 70 (1st Cir. 2004), rev'd on other grounds sub nom. Champagne v. United States, 543 U.S. 1102 (2005).  Rather, law enforcement received information from Defendant's own son, Antonio, that his mother (Defendant's wife) was missing and that Defendant was acting strangely. Antonio also reported that Defendant offered only evasive and cryptic answers in response to inquiries about his mother's whereabouts but also indicated she had died without providing the location of her body.[19]  Viewing these facts objectively, the Court finds that a reasonable officer could have understood Defendant's evasiveness and shifting statements about his elderly wife's whereabouts – coupled with her unexplained absence – as an indication that she was potentially in danger and in need of immediate aid.[20]  See Fisher, 558 U.S. at 47; see also Ryburn, 565 U.S. at 476-77 ("[A] combination of events each of which is mundane when viewed in isolation may paint an alarming picture."); Caniglia, 141 S. Ct. at 1605 (Kavanaugh, J., concurring) (emergency aid exception implicated where "elderly man is uncharacteristically absent from Sunday church services," "repeatedly fails to answer his phone throughout the day and night," and does not

---

[19] The Court notes that Defendant has not suggested that Antonio provided unreliable information regarding the events at issue.

[20] Additionally, because the officers knew that Defendant and Arline resided together at the residence, the officers had a reasonable basis to believe that they would locate her there.

respond to officers' knocking on his front door during a wellness check); Ocasio, 513 F. Supp. 3d at 320 (exigent circumstances supported by "inability to locate a missing and vulnerable individual to confirm their well-being despite a reasonable investigation and other attempts to reach them"); Dempsey v. Gibson, No. 21-16829, 2023 WL 2064546, at *1 (9th Cir. Feb. 17, 2023) (considering, inter alia, individual's "deceptive conduct" in concluding that officers' warrantless entry into his home was reasonable and emergency aid exception applied).

The Court is not persuaded by Defendant's assertion that it was evident before the warrantless entry that Arline had died and therefore exigent circumstances did not exist.[21]  The officers were not required to accept as truth Defendant's cryptic statements that his wife had died, particularly because he refused to tell Antonio where her body was located and told Antonio he had not called any emergency services.  As courts have previously recognized, a "reportedly 'dead' body might yet be alive and prompt action could save the person."  United States v. Beaudoin, 362 F.3d 60, 70 (1st Cir. 2004); see United States v. Richardson, 208 F.3d 626, 631 (7th Cir. 2000) (concluding that exigent circumstances existed where 911 caller indicated woman had been raped and murdered because caller did not indicate "that the body had been languishing in the house for several days," and there was no evidence that "might have made it clear that the victim was indeed dead, and not hovering on the verge of death"); Wayne v. United States, 318 F.2d 205, 212 (D.C. Cir. 1963) ("Acting in response to reports of 'dead bodies,' the police may find the 'bodies' to be common drunks, diabetics in shock, or distressed cardiac patients . . . . Even the apparently dead often are saved by swift police response.").  As such, the officers could have reasonably understood at the time that Arline may not have been dead and instead potentially seriously injured or

---

[21] See Def. Mot., PageID # 177; Def. Reply (ECF No. 96), PageID # 374; Def. Post-Hearing Brief, PageID # 413 ("[T]he government presented no evidence that the government had any information or reason to believe that Arline Giambro was alive.").

otherwise in need of immediate aid.  Additionally, the officers did "not need *ironclad* proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception."  Fisher, 558 U.S. at 49 (emphasis added); see Brigham City, 547 U.S. at 406 (finding emergency aid exception where only injury police could confirm was bloody lip they saw juvenile inside residence inflict on adult); United States v. Brown, 64 F.3d 1083, 1086 (7th Cir. 1995) ("We do not think that the police must stand outside an apartment, despite legitimate concerns about the welfare of the occupant, unless they can hear screams.").  Rather, they needed "only an objectively reasonable basis for believing" that Arline was potentially inside the residence and "in need of immediate aid."  Fisher, 558 U.S. at 47 (citations and internal quotation marks omitted).  For the reasons set forth above, the Court finds that such a basis existed.[22]

The Court additionally concludes based on the evidence presented that "[t]he manner of the officers' entry was also reasonable."  Brigham City, 547 U.S. at 406; see Bilida v. McCleod, 211 F.3d 166, 172 (1st Cir. 2000) ("[W]here a search is lawful only because of exigent circumstances, the search must be 'strictly circumscribed by the exigencies which justified its initiation.'" (citation omitted)).  When officers arrived at Defendant's residence in search of

---

[22] The Court also briefly addresses Defendant's misplaced reliance on Caniglia v. Strom, 141 S. Ct. 1596 (2021).  See, e.g., Def. Reply, PageID #s 375-76.  In Caniglia, the petitioner's wife asked police to conduct a welfare check on the petitioner because she could not reach him the morning after he had fetched a firearm and implored her "to shoot [him] now or get it over with."  141 S. Ct. 1596, 1598 (internal quotation marks omitted).  After speaking with the police, the petitioner agreed to go to the hospital for a psychiatric evaluation, provided that they would not confiscate his firearms.  Once the petitioner had left, the police entered his home and seized two firearms.  The First Circuit held that the warrantless entry and search was reasonable under the Fourth Amendment because the police had been performing their community-caretaking duties.  The Supreme Court reversed, emphasizing that there is no "freestanding community-caretaking exception" that allows police to conduct a warrantless entry and search of a home.  The Supreme Court noted that the First Circuit's decision had been based "solely on the ground that the decision to remove petitioner and his firearms from the premises fell within a 'community caretaking exception' to the warrant requirement."  Id.  More specifically, the First Circuit did not "consider whether anyone had consented to [the police's] actions; whether these actions were justified by 'exigent circumstances'; or whether any state law permitted this kind of mental-health intervention."  Id.  Here, in contrast, the Court has considered whether the officers' actions were justified not by any "community caretaking" duties but by exigent circumstances.  As such, Caniglia is inapposite to the case at bar.

Arline, they first attempted to make contact with someone inside.  It was only after they received no response to their repeated knocking and banging, heard no noise, and were unable to see inside that they entered the residence by force.  The officers then walked through the various rooms of the residence in search for Arline and, in doing so, forced one locked door open.  In total, the officers spent less than ten minutes in the residence – including the time it took to force the locked door open – before exiting and then proceeding to the garage.  At no point during their entry and search of the residence and surrounding premises did the officers seize any firearms; it was only after a warrant was obtained that they did so.  There is no indication in the record that the officers "transgressed constitutional boundaries" by, for instance, "scrutiniz[ing] [] areas that could not contain" Arline.  See United States v. Taylor, 624 F.3d 626, 633 (4th Cir. 2010).  Based on these facts, the Court finds that "[t]he manner of the officers' entry was also reasonable." Brigham City, 547 U.S. at 406.

Finally, the Court addresses Defendant's suggestion that the officers should have attempted to interview him or send emergency services to the residence rather than conducting the warrantless entry.  (See Def. Mot., PageID #s 173, 179; Def. Post-Hearing Brief (ECF No. 11), PageID # 424.)  This argument fails to recognize that "reasonableness under the Fourth Amendment does not require employing the least intrusive means, because the logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers." Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. 364, 392 (2009) (citation omitted).  Accordingly, even had there been a less intrusive "alternative" to the officers' warrantless entry in this case, "it would offer no support to [Defendant's] contention that [the officers] behaved unreasonably." Taylor, 624 F.3d at 634.  In light of the totality of the circumstances, the officers were not obligated to first seek Defendant's consent to enter the residence or otherwise conduct

their search for Arline in a manner conducive to Defendant's preferences.  See id.; United States v. Banks, 540 U.S. 31, 40 (2003) ("Once the exigency had matured, . . . officers were not bound to learn anything more or wait any longer before going in . . . .").

In sum, judged from the perspective of a reasonable officer on the scene at the time, the Court concludes based on the totality of the circumstances that the officers had "an objectively reasonable basis for believing that" Arline was in the house and "in need of immediate aid." Fisher, 558 U.S. at 47 (internal quotation marks and citations omitted).  Accordingly, their warrantless entry was reasonable.[23]

## III.   CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress (ECF No. 65) is hereby DENIED.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 27th day of April, 2023.

---

[23] The Court notes that neither party addressed the potential application of the inevitable discovery doctrine to this case.  "Under that exception to the exclusionary rule, 'if the prosecution can establish by a preponderance of the evidence that the information [here, the firearms] ultimately or inevitably would have been discovered by lawful means . . . the evidence should be received.'"  United States v. Soto-Peguero, 978 F.3d 13, 20 (1st Cir. 2020) (brackets in original omitted) (quoting Nix v. Williams, 467 U.S. 431, 444 (1984)).  Because the parties have not briefed or otherwise raised the application of this doctrine, the Court has not considered whether it applies here.  See United States v. Herrera, No. 17-CR-10112-ADB, 2018 WL 1020112, at *4 n.10 (D. Mass. Feb. 22, 2018) ("The Court declines to consider the application of the inevitable discovery doctrine sua sponte."); United States v. Ferebee, 957 F.3d 406, 417 n.2 (4th Cir. 2020) ("Because the government did not raise [the inevitable discovery doctrine] below and offered no evidence about the inventory search procedures . . . [that district court determined would have led to inevitable discovery], the district court erred by relying on the inevitable-discovery doctrine."); United States v. Lopez-Soto, 205 F.3d 1101, 1107 (9th Cir. 2000) (concluding that district court "committed clear error" in applying inevitable discovery doctrine because "the government provided no evidence" suggesting the discovery was inevitable and "never argued inevitable discovery to the district court").